Filed 6/26/23  P. v. Sutton CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>VANNOY ZEON SUTTON,<br><br>Defendant and Appellant. | F083379<br><br>(Super. Ct. No. BF180086A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Gregory A. Pulskamp, Judge.

David W. Beaudreau, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Michael A. Canzoneri, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## **INTRODUCTION**

Pretending to be interested buyers, Vannoy Zeon Sutton (appellant) and codefendant Jerry Bowen[1] responded to Miguel Flores's online listing for the sale of used video games. At the agreed upon meeting place, they robbed Flores at gunpoint.

A jury convicted appellant and Bowen of robbery (Pen. Code, §§ 211, 212.5, subd. (c))[2] with enhancements for the use of a firearm (§ 12022.53, subds. (b), (e)(1)) and acting for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and other related offenses and enhancements. The trial court sentenced appellant to 17 years in state prison and Bowen to 22 years in state prison.

On appeal, appellant contends his substantive gang offense conviction, gang enhancement findings, and other gang-related findings must be vacated in light of newly enacted Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699, §§ 1–5). Respondent concedes, and we accept respondent's concession. We reverse the conviction for the substantive gang offense and true findings for the gang enhancement and other gang-related findings, and we remand the matter to give the People the option of retrial.

Appellant raises the related claim that his remaining convictions must be reversed for failure to bifurcate the gang allegations. We conclude any error in failing to bifurcate was harmless. We also reject appellant's assertion that his convictions for carrying a loaded firearm (§ 25850, subd. (a)) are unconstitutional following *New York State Rifle & Pistol Assn., Inc. v. Bruen* (2022) 597 U.S. ___ [142 S.Ct. 2111] (*Bruen*). We affirm.

---

[1] Bowen filed a separate appeal (case No. F083347).

[2] All further statutory references are to the Penal Code unless otherwise indicated.

# PROCEDURAL BACKGROUND

The Kern County District Attorney's Office filed an information charging appellant and Bowen as follows:  count 1 – second degree robbery (§§ 211, 212.5, subd. (c); appellant and Bowen) with a use of a firearm enhancement (§ 12022.53, subd. (b); appellant and Bowen), a gang-related firearm enhancement (§ 12022.53, subd. (e)(1); appellant and Bowen), and a gang enhancement (§ 186.22, subd. (b)(1); appellant and Bowen); count 2 – second degree robbery (§§ 211, 212.5, subd. (c); Bowen only) with a gang enhancement (§ 186.22, subd. (b)(1)); count 3 – carrying a loaded firearm (§ 25850, subd. (a); Bowen only) with the additional allegation that Bowen was not the registered owner of the firearm (§ 25850, subd. (c)(6)) and a gang enhancement (§ 186.22, subd. (b)(1)); count 4 – carrying a loaded firearm (§ 25850, subd. (a); appellant only) with the additional allegation that appellant was not the registered owner of the firearm (§ 25850, subd. (c)(6)) and a gang enhancement (§ 186.22, subd. (b)(1)); count 5 – participation in a criminal street gang (§ 186.22, subd. (a); appellant and Bowen); and count 6 – carrying a loaded firearm (§ 25850, subd. (a); appellant and Bowen) with the additional allegation of active participation in a criminal street gang (§ 25850, subd. (c)(3)).

During trial, pursuant to a negotiated agreement, the People moved to amend the information to add count 7 – misdemeanor petty theft (§§ 484, subd. (a), 488; Bowen only).  Bowen then pled no contest to count 7, and in exchange, the People moved to dismiss count 2.

The jury found appellant guilty as charged.  The jury convicted Bowen of all counts and allegations, except it was unable to reach a verdict on count 5, and the gang-related punishment provision in count 6.

## FACTUAL BACKGROUND

### I.     Appellant and Bowen Rob Flores at Gunpoint.

Flores posted a listing on an internet application called "LetGo," offering to sell several used video games. On January 30, 2020, he was contacted on LetGo by a person with the profile name "Bakersfield Buyer." They negotiated a price for the video games and agreed to meet after Flores's college class that evening at an address in a residential neighborhood.

Flores drove to the agreed upon address around 9:00 p.m. His car was equipped with a dashboard camera. He also brought his Glock 19 handgun, which was equipped with a laser light. The Glock was visible in the center console. Flores testified he brought the Glock for protection.

Flores parked on the street, and appellant and Bowen walked toward his car. Appellant asked to see the video games. Flores agreed, and appellant placed a stack of cash on top of Flores's car. After appellant finished looking through the games, he said something to Bowen that Flores could not make out, and Bowen drew a handgun and pointed it at Flores's face. Bowen sat Flores down in the driver's seat of his car and searched through his pockets. He took out Flores's cell phone and dropped it. He struggled to remove Flores's wallet from his pants pocket and dropped it. There was no cash inside of the wallet. At one point Bowen stopped searching Flores and said, "Oh, I'm sorry. I have schizophrenia. Like sorry about that." Appellant said something to Bowen, and Bowen again raised the handgun and pointed it at Flores's face. Bowen then reached into the car and took Flores's gun from the center console. After Bowen grabbed the gun, appellant told Bowen, "Blast him." Flores told Bowen to "[c]hill," and appellant and Bowen ran off.

Flores drove away from the scene of the robbery and called the police. He met with officers in a nearby parking lot and gave a statement.

The video recording from Flores's dashboard camera was played for the jury. The recording does not include any audio. It shows appellant and Bowen approach Flores's car on foot, then run back the way they came approximately two minutes later. It does not capture the actual robbery. Although Flores's headlights were on, the video is too dark to see appellant's and Bowen's faces. However, their shoes and legs were illuminated and are visible.

Flores identified appellant and Bowen in court at trial. He also identified them in photographic lineups, which he was shown several weeks after the robbery.

On cross-examination, Flores acknowledged he told police on the night of the robbery that the person who did not have the gun (appellant) was the person who searched him and took his gun from the center console. He explained that he was nervous and "shooken up" on the night of the robbery and must have been confused. He also admitted that he knew it was illegal to carry a loaded firearm in his vehicle.

## II. Traffic Stop and Recovery of Flores's Firearm.

On February 15, 2020, around 3:00 a.m., a police detective effectuated a traffic stop on a vehicle driven by appellant for driving on the wrong side of the road. After the officer activated his overhead lights and siren, the vehicle turned into a cul-de-sac. Just before the vehicle came to a stop, the officer saw appellant discard an object out of the driver's side window. Appellant then exited the vehicle and attempted to jump over a wall, but then obeyed commands from the officer to stop and get on the ground. There were four other people in the vehicle, including Bowen, who was sitting in the left rear seat.

Officers recovered the object appellant discarded from the window. It was Flores's Glock 19 handgun with the laser light still attached.

## III.  Bowen Takes a Pendant From a Rival Gang Member (Count 2).

On February 18, 2020, an officer saw Bowen and a known Bloods gang member running through a parking lot.  The officer detained them.  He searched Bowen and located an "S" shaped pendant in his pants pocket.

During the detention, the officer was contacted by Javar Gilmore, who demanded the return of his pendant, and provided a receipt for it.  The officer gave the pendant to Gilmore.

Law enforcement knew Gilmore to be a member of the Country Boy Crips criminal street gang, which is a rival of the Bloods.  The letter "S" is a symbol that gang members associate with that gang.

Officers subsequently obtained video surveillance footage from a nearby business.  The video shows Bowen approach Gilmore.  Gilmore throws the first punch, and a physical exchange ensues.  Afterward, Bowen appears to pick up an object off the ground.

As noted above, prior to the close of evidence the People agreed to dismiss count 2 and allow Bowen to plead no contest to misdemeanor petty theft (count 7).  The only explanation offered by the parties was the prosecutor's statement that the plea agreement was "based on the evidence that we have so far."  The trial court instructed the jury that the underlying evidence was still admissible and relevant "to the extent that that incident provides some insight into the elements that need to be proven in other counts," but that it could not be considered as character evidence.

## IV.  Internet Evidence.

Detectives obtained records from LetGo via search warrant and discovered the "Bakersfield Buyer" account was registered to appellant's Google e-mail address.  They also obtained records from Google, which showed the LetGo application was installed onto a cell phone using appellant's e-mail address when the phone was located at 129 Cypress Street in Bakersfield.  The detectives were familiar with appellant and knew he

6.

resided at that address, which is located approximately one block from the scene of the robbery.

Detectives also obtained records for appellant's and Bowen's Facebook accounts via search warrant. The records showed they had been "friends" on Facebook since April 2019, and that they communicated on Facebook regularly. Their accounts contained numerous photos of them together. In several of these photos, appellant and Bowen were with other Bloods gang members, wearing gang colors, and showing gang signs. One of these photographs shows appellant and Bowen together in front of appellant's residence at 129 Cypress Street. Another photograph shows appellant holding Flores's Glock handgun, which is identifiable by the distinctive laser light attachment. In another photograph, Bowen is standing with appellant and wearing distinctive red shoes with white soles. Bowen can be seen wearing the same shoes in the dashboard camera footage from Flores's car.

The Facebook records also included conversations indicating involvement in criminal activity. In October 2019, appellant sent Bowen a message asking, "Did you bring [my] banger back yet?" Also in October 2019, appellant had a conversation with "Mudd Ball," who appears to be appellant's stepfather. They discussed committing crimes for the benefit of the Bloods gang, and appellant reaffirmed that he is a "Crip Killer all the way." In December 2019, appellant had a conversation with "Jeff Brown," who was later determined to be Bowen's cousin, regarding luring potential robbery victims by listing items for sale online on an application like LetGo.

## V. Gang Evidence.

In addition to the Facebook records described above, the People presented extensive evidence that appellant and Bowen were active members of the Bloods criminal street gang. This included evidence that appellant and Bowen were targeted in shootings by rival gang members, and contacts with law enforcement during which appellant and

Bowen were associating with known gang members and wearing gang clothing. Based on this evidence, the People's gang expert opined that appellant and Bowen were active members of the Bloods criminal street gang.

The gang expert also testified that the primary activities of the Bloods gang include homicide, assault with a deadly weapon, robbery, burglary, and firearm possession. He explained that firearm possession is especially important to status within the gang because it allows a gang member to "put in work," which includes shooting rival gang members and committing crimes such as burglary and robbery, which benefits the gang.

To establish that the Bloods gang engages in a pattern of criminal activity, the gang expert described three predicate offenses committed by Bloods gang members. In each predicate offense, an individual Bloods gang member was convicted of illegal firearms possession. The predicate offenses did not involve appellant or Bowen. The gang expert offered no opinion on how the predicate offenses benefitted the Bloods, and there was no evidence any predicate offense was committed by more than one person.

Based on a hypothetical question mirroring the facts of the Flores robbery, the gang expert opined that the robbery was committed for the benefit of the Bloods gang. He explained that the robbery would enhance the reputation of the gang and instill fear in both rival gang members and the community generally. Additionally, any property obtained during a robbery would benefit the gang financially. With respect to firearm possession, the gang expert stated that possession of a firearm bolsters the status of an individual gang member within the gang because it can be used to commit crimes and intimidate rivals.

## VI.    Appellant's Testimony.

Appellant elected to testify in his own defense and claimed no robbery occurred. He admitted to being a gang member but claimed he was a member of the "Warlord Piru"

gang and not the Bloods gang. He identified himself and Bowen in the dashboard camera video. He claimed that he initially intended to buy video games from Flores, but when he arrived at the meeting place with Bowen, Flores offered to sell his handgun. He testified he agreed to buy the handgun, and Flores stated he would have to report it stolen because it was registered in his name. Flores told them about his dashboard camera, so appellant and Bowen ran away in view of the camera as part of a "little fake scene" to make it look like a robbery.

## DISCUSSION

### I. The Record is Insufficient to Sustain the Substantive Gang Offense and Gang-related Findings Under Newly Enacted Assembly Bill No. 333. We Reverse and Remand for Further Proceedings.

While this appeal was pending, the Legislature enacted Assembly Bill No. 333, which became effective on January 1, 2022. Assembly Bill No. 333 amended section 186.22 to modify the showing necessary to sustain gang offenses and enhancements. Appellant contends Assembly Bill No. 333 applies retroactively to this case, and that his gang offense, enhancements, and findings must be reversed. He argues the evidence at trial was insufficient under the law as amended, and that the jury instructions did not reflect said amendments.

The substantive gang offense (§ 186.22, subd. (a)) and the gang enhancement (§ 186.22, subd. (b)(1)) require the People to prove the existence of a "criminal street gang." To do so, the People must establish a " 'pattern of criminal gang activity' " by proving, among other things, the existence of two or more predicate crimes committed by gang members. (§ 186.22, subd. (e)(1).) As pertinent here, Assembly Bill No. 333 changed this predicate requirement in two ways. First, the People must prove that each predicate offense was committed by three or more gang members; proof of offenses committed by individual gang members is no longer sufficient. (§ 186.22, subd. (f); *People v. Lopez* (2021) 73 Cal.App.5th 327, 344.) Second, the People must prove that

9.

the predicate offenses "commonly benefitted a criminal street gang, and the common benefit of the offenses is more than reputational." (§ 186.22, subd. (e)(1).)

Respondent concedes Assembly Bill No. 333's amendments to section 186.22 apply retroactively to this case. We agree. As we explained in *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1126, this aspect of Assembly Bill No. 333 "was an ameliorative change in the law that applies retroactively to cases not yet final on appeal" because it "increased the evidentiary burden necessary to prove a gang-related enhancement." Our Supreme Court subsequently reached the same conclusion in *People v. Tran*, holding that "[t]hese changes have the effect of 'increas[ing] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement,' with obvious benefit to defendants like Tran." (*People v. Tran* (2022) 13 Cal.5th 1169, 1207 (*Tran*).)

Respondent also concedes appellant's substantive gang offense conviction (count 5) must be reversed and gang enhancements (counts 1 and 4) must be vacated because the evidence at trial was insufficient under section 186.22 as amended. Again, we agree. Each predicate offense in this case involved conduct by only one gang member, and the People offered no evidence or expert opinion that the predicates benefitted the gang.

Additionally, respondent concedes that the gang-related punishment provision finding as to count 6 must be vacated for insufficient evidence. Section 25850, subdivision (c)(3), requires proof that the defendant was "an active participant in a criminal street gang, as defined in subdivision (a) of [s]ection 186.22," the substantive gang offense. Our Supreme Court has held that all the elements in section 186.22, subdivision (a) must be satisfied before the alternative punishment provision of section 25850, subdivision (c)(3) applies. (*People v. Lamas* (2007) 42 Cal.4th 516, 524 [analyzing the interplay of section 186.22, subdivision (a), with former section 12031, subdivision (a)(2)(C)].) Because the evidence was insufficient to sustain appellant's

10.

conviction for the substantive gang offense, it was also insufficient to sustain the gang-related punishment provision finding as to count 6.

We also agree that appellant's gang-related firearm enhancement (count 1) must be vacated for insufficient evidence. The evidence at trial only established that a principal in the robbery, codefendant Bowen, used a firearm. It did not establish that appellant personally used a firearm. Appellant's liability for the firearm enhancement was based on section 12022.53, subdivision (e)(1), which provides: "The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22. [¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)." As we explained above, the evidence was insufficient to sustain the section 186.22, subdivision (b) gang enhancements. Thus, the evidence is also insufficient to sustain the gang-related firearm enhancement.

Accordingly, we reverse the conviction for the substantive gang offense and vacate the gang enhancements, gang-related firearm enhancement, and gang-related punishment provision. On remand, the People will have the option to retry the reversed offense and enhancements. (*People v. Sek* (2022) 74 Cal.App.5th 657, 669 [" 'Because we do not reverse based on the insufficiency of the evidence required to prove a violation of the statute as it read at the time of trial, the double jeopardy clause of the Constitution will not bar a retrial.' "].)

## II. Any Presumed Error Resulting from the Failure to Bifurcate Gang Allegations was Harmless.

In addition to amending section 186.22, Assembly Bill No. 333 also created section 1109. This section requires that a trial court conduct a bifurcated proceeding on the truth of gang enhancements alleged under section 186.22, subdivision (b) or (d), if requested by the defense. (§ 1109, subd. (a).) It also requires a bifurcated trial for any charge of participation in a criminal street gang (§ 186.22, subd. (a)). (§ 1109, subd. (b).)

11.

Appellant claims section 1109 applies retroactively, and the trial court's failure to bifurcate warrants reversal of his underlying convictions. Alternatively, appellant argues that even if section 1109 does not apply retroactively, the trial court abused its discretion by denying his motion to bifurcate under then existing law. Respondent argues that section 1109 applies prospectively only, and that lack of bifurcation was harmless error.

As we explain below, we agree that the trial court's failure to bifurcate pursuant to section 1109 or under then existing law was harmless because there is no basis to conclude bifurcation would have affected the outcome of the trial. Accordingly, we need not consider whether section 1109 applies retroactively or the merits of appellant's bifurcation motion.[3]

### A. Relevant Procedural Background.

Prior to trial, appellant and Bowen moved to bifurcate the gang allegations under then existing law, contending the gang evidence was highly prejudicial and not relevant to the underlying charges. The trial court denied the motion, concluding the gang evidence was relevant to the motive to commit the underlying offenses.

### B. We Apply the *Watson* Standard.

Appellant argues the trial court's failure to bifurcate is subject to the more stringent "beyond a reasonable doubt" standard for federal constitutional error set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). Respondent, on the other hand, argues the standard of review set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) is appropriate. Under the *Watson* standard, which applies to errors of state law, reversal is not required unless it is reasonably probable the defendant would have obtained a more favorable result had the error not occurred. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

---

[3] The question of whether section 1109 applies retroactively to cases that are not yet final is currently under review by the California Supreme Court in *People v. Burgos* (2022) 77 Cal.App.5th 550, review granted July 13, 2022, S274743.

We agree with respondent. Appellant's right to bifurcation under section 1109 is purely statutory. " 'Typically, a defendant who has established error under state law must demonstrate there is a reasonable probability that in the absence of the error he or she would have obtained a more favorable result.' " (*People v. Anzalone* (2013) 56 Cal.4th 545, 553; accord, *People v. Epps* (2001) 25 Cal.4th 19, 29 [where the error "is purely one of state law, the *Watson* harmless error test applies"].) The denial of the motion to bifurcate is also an issue of state law, and therefore subject to the same harmless error standard. (*People v. Flinner* (2020) 10 Cal.5th 686, 713; *People v. Pinholster* (1992) 1 Cal.4th 865, 931–932 [failure to sever robbery count from other charges subject to *Watson* standard] disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459; see *People v. Champion* (1995) 9 Cal.4th 879, 923 [failure to exclude gang evidence subject to *Watson* standard], disapproved on other grounds in *People v. Combs* (2004) 34 Cal.4th 821, 860.)

Recently, in *Tran*, our high court held that the failure to bifurcate pursuant to section 1109 is not structural error. (*Tran*, *supra*, 13 Cal.5th at pp. 1208–1210.) The court also rejected the appellant's argument that the *Chapman* standard for federal constitutional error applies, reasoning that the admission of gang evidence in that case was not so prejudicial that it rendered the trial " 'fundamentally unfair.' " (*Tran*, *supra*, 13 Cal.5th at p. 1209.) Instead, it evaluated the trial court's failure to bifurcate under the *Watson* standard. (*Tran*, at pp. 1209–1210.)

For the reasons discussed below, we see no basis to conclude the admission of gang evidence rendered the trial fundamentally unfair, or otherwise implicated appellant's federal constitutional rights. (See *Tran*, *supra*, 13 Cal.5th at p. 1209.) Accordingly, we apply the *Watson* standard.

13.

## C. Any Presumed Error was Harmless.

In assessing prejudice under *Watson*, "an appellate court may consider 'whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 870.)

Here, the evidence establishing appellant's guilt of the underlying charges was overwhelming. Flores identified appellant and Bowen in photographic lineups and in court at trial. Two weeks after the robbery, appellant was caught attempting to discard Flores's stolen firearm during a traffic stop, with Bowen in the back seat. Records from LetGo obtained by law enforcement showed appellant was the owner of the "Bakersfield Buyer" account used to contact Flores to set up the robbery. Records from Facebook included a photo of appellant posing with Flores's gun, and a photo of Bowen wearing the same distinctive red shoes seen in the dashboard camera recording. Additionally, the records contained a conversation between appellant and Bowen's cousin discussing setting up robberies by listing items for sale online; the same modus operandi employed in the robbery of Flores. Finally, appellant testified that he and Bowen were the two individuals who met with Flores, and he identified himself and Bowen in the dashboard camera recording.

Appellant contends that if the gang allegations had been tried separately, it is likely that the jury would have believed his testimony that he purchased the handgun from Flores and that no robbery occurred. We disagree. During closing argument, the prosecutor argued appellant's testimony was not credible, and that his claim that he purchased Flores's firearm was not reasonable. The prosecutor explained that if Flores needed to feign a robbery to report the handgun stolen, there was no reason for Flores to later identify appellant and Bowen to the police. There was also no need to film appellant and Bowen fleeing on the dashboard camera. Moreover, appellant's claim that

14.

he only intended to purchase video games from Flores was wholly undermined by his online conversation with Bowen's cousin about using online listings to set up robberies. The verdict, therefore, demonstrates the jury agreed and rejected appellant's testimony, and the circumstantial evidence clearly supports the jury's decision.

Appellant also contends that the substantial amount of evidence tying him to the Bloods gang was highly prejudicial because it suggested he was involved in uncharged criminal conduct and portrayed him "as a young man immersed in a dangerous and violent lifestyle." We agree that evidence of gang membership and prior criminal acts inherently carries some risk that a jury will improperly infer that a defendant has a propensity to commit criminal offenses. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) However, nothing in Assembly Bill No. 333 or section 1109 "limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges." (*People v. Ramos*, *supra*, 77 Cal.App.5th at p. 1132.) This includes evidence that is offered for identity, motive, or intent (among others) under Evidence Code section 1101, subdivision (b). Here, some of the gang evidence was relevant to appellant's and Bowen's motive. This was particularly true in count 2, where the evidence showed Bowen took a pendant of a gang symbol from a rival gang member. It was also relevant to identity, as it buttressed the connection between appellant and Bowen that was central to the People's case. Because it is very likely that at least some of the gang evidence admitted in appellant's trial would still have been admissible in a bifurcated trial, the potential for prejudice is significantly limited. (See *People v. Hernandez*, *supra*, 33 Cal.4th at pp. 1049–1050.)

We also observe that the jurors were given a limiting instruction not to consider the gang evidence for any improper purpose, including that appellant "is a person of bad character or that he has a disposition to commit crime." (See CALCRIM No. 1403.) We presume the jury followed this instruction. (See *People v. Franklin* (2016) 248 Cal.App.4th 938, 953 ["We presume that the jury followed these limiting instructions

15.

[regarding considering gang evidence for limited purpose], and there is nothing in this record to rebut that presumption."].)

Finally, any inference of prejudice stemming from the gang evidence is negated by the fact that the jury was unable to reach a verdict on all counts and allegations. Specifically, the jury deadlocked as to Bowen on count 5, active participation in a criminal street gang (§ 186.22, subd. (a)), and the gang-related punishment provision as to count 6 (§ 25850, subd. (c)(3)). This result demonstrates the jury was not simply overwhelmed by the presentation of the gang evidence, but that it closely and carefully examined the evidence supporting each allegation. (See *People v. Ramos*, *supra*, 77 Cal.App.5th at pp. 1131–1132 ["It is apparent from this record the jury did not simply rely on the gang evidence to convict the defendants of the charged crimes."].)

Considering the strength of the evidence, the use of a limiting instruction, and the likelihood that some gang evidence would still have been admitted even if the gang allegations had been bifurcated, it is not reasonably probable that the admission of gang evidence impacted the result of appellant's trial. Therefore, we conclude the trial court's failure to bifurcate pursuant to section 1109 or under then existing law was harmless under *Watson*.

## III.    *Bruen* Does Not Render Appellant's Convictions for Carrying a Loaded Firearm Unconstitutional.

Appellant was convicted in counts 4 and 6 of carrying a loaded firearm in public in violation of section 25850, subdivision (a). While this appeal was pending, the United States Supreme Court issued *Bruen*, holding that the "proper cause" requirement of New York State's public carry licensing scheme violated the Second Amendment. (*Bruen*, *supra*, 597 U.S. ___ [142 S.Ct. at p. 2156].)

Appellant contends his carrying a loaded firearm convictions must be reversed under *Bruen*, arguing that California's analogous "good cause" requirement (§§ 26150, subd. (a)(2), 26155, subd. (a)(2)), renders section 25850 and California's licensing

scheme facially unconstitutional.  We disagree.  While we recognize that California's "good cause" requirement is unconstitutional under *Bruen*, the rest of the licensing scheme, and section 25850, remain facially valid.

### A.  Relevant Statutes.

Section 25850, subdivision (a) states:  "A person is guilty of carrying a loaded firearm when the person carries a loaded firearm on the person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory."[4]

Section 25850 does not apply to a person who has received a license to carry a concealed weapon.[5]  (§ 26010.)  To obtain such a license, one must apply with either the county sheriff (§ 26150), or the chief of police (§ 26155).  Under California's licensing statutes, the sheriff or chief of police "may issue a license to [the applicant] upon proof of all of the following:

"(1)  The applicant is of good moral character.

"(2)  Good cause exists for issuance of the license.

---

[4]  A violation of section 25850 is punishable as a misdemeanor unless the jury finds true one of the punishment provisions set forth in subdivision (c)(1) through (6), inclusive.  Here, in count 4, the jury found true the allegation that appellant was not the registered owner of the handgun (§ 25850, subd. (c)(6)), elevating the conviction to a wobbler.  In count 6, the jury found true the allegation that appellant was an active participant in a criminal street gang (§ 25850, subd. (c)(3)), elevating the conviction to a felony.

[5]  Section 25850 is subject to numerous other statutory exemptions, such as for peace officers (§ 25900), military personnel (§ 26000), persons using target ranges to practice shooting (§ 26005, subd. (a)), persons carrying a loaded firearm within the person's place of business or the person's private property (§ 26035), lawful hunting (§ 26040), persons carrying a loaded firearm who reasonably believe that "any person or the property of any person is in immediate, grave danger" and "the carrying of the weapon is necessary for the preservation of that person or property" (§ 26045, subd. (a)), and persons under threat from the subject of a restraining order (*id.*, subd. (b)).

"(3)  [The applicant is a resident of the county or a city within the county.]

"(4)  The applicant has completed a course of training as described in Section 26165."  (§§ 26150, subd. (a), 26155, subd. (a).)

Before a license may issue, the fingerprints of the applicant must be taken and forwarded to the Department of Justice.  (§ 26185, subd. (a)(1).)  A license "shall not be issued if the Department of Justice determines that the person is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm."  (§ 26195, subd. (a).)

### B.  *New York State Rifle & Pistol Assn., Inc. v. Bruen.*

In *Bruen*, the United States Supreme Court considered the constitutionality of New York's public carry licensing scheme.  Under that scheme, to obtain a license to possess a firearm at home or his place of business, an applicant "must convince a 'licensing officer'—usually a judge or law enforcement officer—that, among other things, he is of good moral character, has no history of crime or mental illness, and that 'no good cause exists for the denial of the license.' "  (*Bruen*, *supra*, 597 U.S. ___ [142 S.Ct. at pp. 2122–2123].)  Prior to *Bruen*, to obtain a license to carry a firearm outside of the home or place of business for self-defense purposes, the applicant had to establish " 'proper cause,' " which New York courts interpreted as requiring " 'a special need for self-protection distinguishable from that of the general community.' "  (*Id.* at p. 2123.)  This "demanding" standard generally required the applicant to present "evidence 'of particular threats, attacks or other extraordinary danger to personal safety.' "  (*Ibid*.)

The petitioners in *Bruen* were "law-abiding" residents of New York who applied for public carry licenses for general self-defense purposes.  (*Bruen*, *supra*, 597 U.S. ___ [142 S.Ct. at pp. 2124–2125].)  After their applications were denied for failure to satisfy the "proper cause" requirement, they sued for declaratory and injunctive relief, contending state officials violated their Second Amendment rights "by denying their unrestricted-license applications on the basis that they had failed to show 'proper cause,'

i.e., had failed to demonstrate a unique need for self-defense." (*Id.* at p. 2125, italics omitted.)

*Bruen* held the New York licensing scheme's proper cause standard violates the Second Amendment because the state "issues public-carry licenses only when an applicant demonstrates a special need for self-defense." (*Bruen*, *supra*, 597 U.S. ___ [142 S.Ct. at pp. 2122, 2156].) Applying the "text-and-history standard" set forth in *District of Columbia v. Heller* (2008) 554 U.S. 570, the court began by reasoning that the plain text of the Second Amendment "presumptively guarantees" law abiding citizens "a right to 'bear' arms in public for self-defense." (*Bruen*, *supra*, 597 U.S. ___ [142 S.Ct. at pp. 2135, 2138].) The court then considered "the Nation's historical tradition of firearm regulation," and concluded that "the historical record … does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense" or "any … tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense." (*Id.* at pp. 2129–2130, 2138, fn. omitted.)

*Bruen* noted that like New York, California, the District of Columbia, and four other states, have " 'may issue' licensing laws," which include "analogues to the 'proper cause' " standard. (*Bruen*, *supra*, 597 U.S. ___ [142 S.Ct. at pp. 2123–2124].) Under these " 'may issue' " licensing regimes, "authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license." (*Ibid.*) On the other hand, 43 other states "are 'shall issue' jurisdictions, where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." (*Id*. at p. 2123, fn. omitted.) In a footnote, the court made clear that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].' " (*Id.* at p. 2138, fn. 9.)

"[S]hall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' [Citation.] And they likewise appear to contain only 'narrow, objective, and definite standards' guiding licensing officials, [citation], rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion,' [citation]—features that typify proper-cause standards like New York's." (*Ibid.*)

In his concurrence, Justice Kavanaugh clarified that "the Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense." (*Bruen*, *supra*, 597 U.S. ___ [142 S.Ct. at p. 2161] (conc. opn. of Kavanaugh, J.).) "Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so. Likewise, the 6 States including New York potentially affected by today's decision may continue to require licenses for carrying handguns for self-defense so long as those States employ objective licensing requirements like those used by the 43 shall-issue States." (*Id.* at p. 2162.)

### C. Section 25850 and California's Licensing Scheme are Facially Constitutional.

#### 1. *Appellant has Standing to Bring a Facial Challenge Only.*

Initially, respondent contends appellant lacks standing to bring this constitutional challenge because there is no evidence that he suffered a constitutional injury from the good cause requirement. We agree that the record does not show, and appellant does not claim, that he applied for and was denied a license to carry a concealed firearm. Nor does appellant make any showing that he was deterred from seeking a license because of the now invalid good cause provision. Thus, appellant lacks standing to bring an as applied constitutional challenge on this basis, because he cannot show " ' "that his rights

[were] affected injuriously by the law which he attacks and that he is actually aggrieved by its operation." ' " (*People v. Conley* (2004) 116 Cal.App.4th 566, 576.)

Appellant repeatedly emphasizes, however, that his claim is not an as applied challenge but a facial constitutional challenge. "A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual." (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 (*Tobe*).) Because appellant was convicted of violating section 25850, subdivision (a), "[t]he question of the validity of the statute, upon which the prosecution is based, is necessarily presented." (*Smith v. Cahoon* (1931) 283 U.S. 553, 562.) Therefore, by virtue of his conviction, appellant has standing to challenge the facial validity of section 25850. This extends to his challenge to the facial validity of California's licensing scheme to the extent that it implicates the constitutionality of section 25850.

Appellant also suggests he has standing based on the overbreadth doctrine. "Technically, overbreadth is a standing doctrine that permits parties in cases involving First Amendment challenges to government restrictions on noncommercial speech to argue that the regulation is invalid because of its effect on the First Amendment rights of others not presently before the Court." (*Hoffman Estates v. Flipside, Hoffman Estates, Inc.* (1982) 455 U.S. 489, 508 (conc. opn. of White, J.).) "Outside these limited settings, and absent a good reason, we do not extend an invitation to bring overbreadth claims." (*Sabri v. United States* (2004) 541 U.S. 600, 610.) Appellant has not cited, nor are we aware of, any case applying this doctrine to Second Amendment claims. As the United States Supreme Court has explained, "[a]pplication of the overbreadth doctrine in this manner is, manifestly, strong medicine. It has been employed by the Court sparingly and only as a last resort." (*Broadrick v. Oklahoma* (1973) 413 U.S. 601, 613.) Accordingly, we decline to extend the overbreadth doctrine to appellant's claim.

### 2. Standard of Review.

" ' "To support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute .…  Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." ' " (*Tobe*, *supra*, 9 Cal.4th at p. 1084.)

"A defendant challenging the constitutionality of a statute carries a heavy burden: 'The courts will presume a statute is constitutional unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 696.)  Indeed, "Facial challenges to statutes and ordinances are disfavored.  Because they often rest on speculation, they may lead to interpreting statutes prematurely, on the basis of a bare-bones record.  [Citation.] Also, facial challenges conflict with the fundamental principle of judicial restraint that courts should not decide questions of constitutional law unless it is necessary to do so, nor should they formulate rules broader than required by the facts before them." (*Building Industry Assn. of Bay Area v. City of San Ramon* (2016) 4 Cal.App.5th 62, 90, citing *Washington State Grange v. Washington State Republican Party* (2008) 552 U.S. 442, 450.)

### 3. California's Good Cause Requirement is Severable.

*Bruen* deemed the good cause provision in California's licensing statutes (§§ 26150, subd. (a), 26155, subd. (a)) to be equivalent to New York's invalid "proper cause" standard.  (*Bruen*, *supra*, 597 U.S. ___ [142 S.Ct. at pp. 2123–2124].)  Thus, following *Bruen*, the good cause provision is clearly unconstitutional.  Respondent concedes this, noting that the day after *Bruen* was issued, the California Attorney General issued a "Legal Alert" advising permitting agencies throughout the state that they may no

longer enforce the good cause provision.  (Office of the Attorney General, Legal Alert: U.S. Supreme Court Decision in *New York State Rifle & Pistol Association v. Bruen*, No. 20-843 (June 24, 2022) <https://oag.ca.gov/system/files/media/legal-alert-oag-2022-02.pdf > [as of June 22, 2023].)

Although the good cause provision is unconstitutional, it does not necessarily render the entire licensing scheme invalid.  Rather, we must consider whether the good cause provision is severable.  " 'Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem,' severing any 'problematic portions while leaving the remainder intact.'  [Citation.]  Because '[t]he unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions,' [citation] the 'normal rule' is 'that partial, rather than facial, invalidation is the required course.' " (*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.* (2010) 561 U.S. 477, 508.)

"In determining whether the invalid portions of a statute can be severed, we look first to any severability clause.  The presence of such a clause establishes a presumption in favor of severance."  (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 270 (*Matosantos*).)  Where, as here, the statute contains no such clause, we consider whether the invalid provision is " 'grammatically, functionally, and volitionally separable.' " (*Id.* at p. 271.)  As we explain below, we conclude the criteria for severability are satisfied.

"Grammatical separability … depends on whether the invalid parts 'can be removed as a whole without affecting the wording' or coherence of what remains." (*Matosantos*, *supra*, 53 Cal.4th at p. 271.)  In other words, "the valid and invalid parts of the statute can be separated by paragraph, sentence, clause, phrase, or even single words." (*Abbott Laboratories v. Franchise Tax Bd.* (2009) 175 Cal.App.4th 1346, 1358.)  Here, the now unconstitutional "good cause" requirement in subdivision (a)(2) of the licensing statutes (§§ 26150, 26155), is grammatically detached from the other licensing

23.

requirements set forth in subdivision (a). Removing subdivision (a)(2) does not impair the wording or coherence of the remaining statutes.

Functional separability depends on whether, after separation of the invalid portion, the remainder of the statute is " ' " 'complete in itself' " ' and 'capable of independent application.' " (*Abbott Laboratories v. Franchise Tax Bd.*, *supra*, 175 Cal.App.4th at p. 1358.) Again, the "good cause" requirement is just one of four requirements to obtain a license to carry a concealed firearm. Its removal would have no impact on the independent application of the remainder of the statute.

"Volitional separability depends on whether the remainder ' "would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute." ' " (*Matosantos*, *supra*, 53 Cal.4th at p. 271.) "The issue, when assessing volitional separability, is not whether a legislative body would have preferred the whole to the part .… Instead, the issue is whether a legislative body, knowing that only part of its enactment would be valid, would have preferred that part to nothing, or would instead have declined to enact the valid without the invalid." (*Id.* at p. 273.) We conclude the Legislature would prefer a licensing scheme without a "good cause" provision over having no licensing scheme at all. The clear purpose of the licensing scheme is to effectuate "the government's vital public safety interest in controlling dangerous weapons." (*Nichols v. County of Santa Clara* (1990) 223 Cal.App.3d 1236, 1246.) Given this interest, there is no basis to conclude that the Legislature would also want to do away with the remaining licensing requirements, which are also geared toward enhancing public safety. Accordingly, all three of the severability criteria are satisfied, and the good cause provision is severable from California's licensing scheme.

### 4. *Section 25850 and California's licensing scheme remain facially valid.*

Having concluded the good cause requirement is severable, we turn to whether *Bruen* otherwise impacted the constitutional validity of section 25850 or California's

24.

licensing scheme. We conclude it did not. While appellant notes that *Bruen* held the Second Amendment protects the right to carry handguns publicly for self-defense, it did not hold that this right is absolute. Rather, *Bruen* expressly approved of licensing schemes that condition a person's ability to lawfully carry a firearm in public on certain conditions. (*Bruen*, *supra*, 597 U.S. ___ [142 S.Ct. at p. 2138, fn. 9].) Following severance, the remaining requirements to obtain a license in California include "good moral character," proof of residency, completion of a firearms safety course, and a background check. (§§ 26150, 26155, 26185, 26195.) Consistent with *Bruen*, these requirements are " 'narrow, objective, and definite,' " and appear "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' " (*Bruen*, *supra*, 597 U.S. ___ [142 S.Ct. at p. 2138, fn. 9].)

Appellant argues that even if the good cause provision is severable, the licensing statutes are still facially unconstitutional under *Bruen* because the "may issue" language in the statutes gives licensing officials the authority to deny license applications even if the other enumerated requirements have been met. He relies on language from California appellate cases characterizing the discretion of licensing authorities as "extremely broad," and "unfettered." (*Gifford v. City of Los Angeles* (2001) 88 Cal.App.4th 801, 805; *CBS, Inc. v. Block* (1986) 42 Cal.3d 646, 655.)

We are not persuaded. The cases cited by appellant evaluated the discretion of licensing authorities when the good cause provision was still valid. Without it, the discretion of licensing authorities is significantly limited. Moreover, *Bruen*'s holding is based on its analysis of the "proper cause" standard in the New York statute. The court makes no mention of, let alone relies upon, the presence or absence of "may issue" language. In fact, the New York statute at issue included "shall issue" language. (See N.Y. Penal Law former § 400.00(2) (2021) ["A license for a pistol or revolver, other than an assault weapon or a disguised gun, *shall be issued* to ... (f) have and carry concealed, without regard to employment or place of possession, by any person when proper cause

25.

exists for the issuance thereof ...." (italics added)].) Moreover, at least two of the "shall issue" licensing regimes identified by the high court utilize the permissive "may" in their statutes. (See, e.g., Conn. Gen. Stat. § 29-28(b) (2021); Del. Code, tit. 11, § 1441 (2022).) Accordingly, the "may issue" language in California's licensing statutes does not affect their validity.

Appellant also contends that severance analysis cannot be "applied retroactively" to "save" his convictions, because the good cause provision was in effect when he committed the offenses. This argument goes beyond the scope of his facial constitutional claim, which is limited to the text of the challenged statute. Instead, it requires us to consider the constitutionality of the good cause provision *as applied* to the particulars of appellant's case. (See *Tobe*, *supra*, 9 Cal.4th at p. 1084 [an as applied challenge "contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the statute or ordinance has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right"].) Appellant repeatedly emphasizes that he is raising a facial challenge rather than an as applied challenge, so we decline to construe it differently. In any event, as we explained above, appellant lacks standing to bring an as applied challenge, because the now unconstitutional good cause requirement was wholly irrelevant to appellant's convictions.

To conclude, the good cause requirement is unconstitutional under *Bruen*, but it is severable and does not otherwise impact the facial constitutional validity of section 25850 or California's licensing scheme. Accordingly, appellant cannot demonstrate that following *Bruen*, section 25850 and the licensing scheme " 'inevitably pose a present total and fatal conflict' " with the Second Amendment. (*Tobe*, *supra*, 9 Cal.4th at p. 1084.)

**IV. Appellant May Address the Applicability of Senate Bill No. 567, Assembly Bill No. 124, and Assembly Bill No. 518 on Remand.**

Appellant contends remand and resentencing are required pursuant to three new sentencing laws that became effective while this appeal was pending: Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3), Assembly Bill No. 124 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 695, § 5), and Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441, § 1).

We need not address whether remand is appropriate based on these enactments because we have already determined remand and resentencing are necessary. Regardless of how the parties elect to proceed on remand, appellant will be entitled to " 'a full resentencing as to all counts … so the trial court can exercise its sentencing discretion in light of the changed circumstances.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) If appellant so chooses, he may raise his claims regarding the applicability of these enactments in the trial court during resentencing.

We take no position on how the trial court should exercise its sentencing discretion when it resentences appellant.

## DISPOSITION

The true findings in count 1 regarding the gang enhancement and gang-related firearm enhancement are vacated. The true finding in count 4 regarding the gang enhancement is vacated. The conviction in count 5 is reversed. The true finding in count 6 regarding the gang-related punishment provision is vacated.

Appellant's sentence is vacated, and this matter is remanded for further proceedings. The People shall have the option to retry appellant regarding the gang enhancement and gang-related firearm enhancement in count 1, the gang enhancement in count 4, the charge of active gang participation in count 5, and the gang-related punishment provision in count 6. If the People do not bring appellant to retrial within the

27.

time limits of section 1382, subdivision (a)(2), the trial court shall proceed to resentence appellant accordingly.  In all other respects, appellant's judgment is affirmed.


LEVY, J.

WE CONCUR:


HILL, P. J.


MEEHAN, J.


28.